

AES:SPN/MKM/KDE/PTH/KTF/DMP/BDM
F.#2015R00747

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

HUGO JINKIS,
MARIANO JINKIS,
FULL PLAY GROUP S.A.,
HERNAN LOPEZ,
CARLOS MARTINEZ,
GERARD ROMY,
ARIEL ALVARADO,
MANUEL BURGA,
LUÍS CHIRIBOGA,
MARCO POLO DEL NERO,
EDUARDO DELUCA,
EUGENIO FIGUEREDO,
JOSÉ LUÍS MEISZNER,
ROMER OSUNA,
RICARDO TEIXEIRA,
REYNALDO VASQUEZ and
JACK WARNER,

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. <u>15-252 (S-3) (PKC)</u>
(T. 8, U.S.C., § 1451(e); T. 18, U.S.C.,
§§ 981(a)(1)(C), 982(a)(1), 982(a)(6),
982(b), 1343, 1349, 1425(a),
1956(a)(2)(A), 1956(h), 1962(d), 1963,
1963(a), 1963(m), 2 and 3551 <u>et seq.</u>;
T. 21, U.S.C., § 853(p); T. 26, U.S.C.,
§ 7206(2); T. 28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

<u>INTRODUCTION TO ALL COUNTS</u>

     At all times relevant to this Superseding Indictment (the "Indictment"), unless

otherwise indicated:

I.      The Enterprise

1.      The Fédération Internationale de Football Association ("FIFA") and its six constituent continental confederations—the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de Football ("UEFA"), the Confédération Africaine de Football ("CAF"), the Asian Football Confederation ("AFC") and the Oceania Football Confederation ("OFC")—together with affiliated regional federations, national member associations and sports marketing companies, collectively constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of legal entities associated in fact (hereinafter the "enterprise"). The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

2.      The principal purpose of the enterprise was to regulate and promote the sport of soccer worldwide. The members of the enterprise carried out this purpose by using a variety of methods and means, including creating and enforcing uniform standards and rules, organizing international competitions and commercializing the media and marketing rights associated with the sport. The members of the enterprise, as well as individuals and entities employed by and associated with the enterprise, frequently engaged in banking and investment activities using United States financial institutions.

3.      The enterprise operated in the Eastern District of New York and elsewhere, including overseas.

2

A.      FIFA

4.      FIFA was the international body governing organized soccer, commonly known outside the United States as football.  FIFA was composed of more than 200 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories—Puerto Rico, Guam, American Samoa and the United States Virgin Islands.  At various times relevant to the Indictment, FIFA was headquartered in Switzerland and also maintained offices elsewhere in the world, including in the United States.

5.      Each of FIFA's member associations also was a member of one of the six continental confederations recognized by FIFA.  Under FIFA's statutes, no national soccer association could become a member of FIFA without first joining one of the six continental confederations.  Under FIFA's statutes, the six continental confederations had certain rights and obligations, including, among other things, that they comply with and enforce FIFA's statutes, regulations and decisions and work closely with FIFA to further FIFA's objectives and organize international soccer competitions.

6.      FIFA's purpose was, among other things, to develop and promote the game of soccer globally by organizing international competitions and by creating and enforcing rules that govern the confederations and member associations.  FIFA financed its efforts in significant part by commercializing the media and marketing rights associated with

the World Cup and other international tournaments. FIFA's sponsors included major U.S.-based companies, which provided FIFA with a significant source of marketing revenue.

7.     FIFA first instituted a written code of ethics in 2004, which code was revised in 2006, 2009 and 2012 (generally, the "code of ethics"). The code of ethics governed the conduct of soccer "officials," which expressly included, among others, various individuals with responsibilities within FIFA, the confederations, member associations, leagues and clubs. At various times relevant to the Indictment, the defendants ARIEL ALVARADO, MANUEL BURGA, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, EUGENIO FIGUEREDO, JOSÉ LUÍS MEISZNER, ROMER OSUNA, REYNALDO VASQUEZ, RICARDO TEIXEIRA and JACK WARNER were soccer officials. Among other things, the code of ethics provided that soccer officials were prohibited from accepting bribes or cash gifts and from otherwise abusing their positions for personal gain. The code of ethics further provided that soccer officials owed certain duties to FIFA and its confederations and member associations, including a duty of absolute loyalty. By 2009, the code of ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to FIFA and its constituent confederations, member associations, leagues and clubs.

B.     The Continental Confederations

8.     In addition to providing representatives who helped to govern FIFA, the six continental confederations worked closely with FIFA and one another to organize international soccer competitions and carry out FIFA directives on a regional basis. The leaders and representatives of the confederations conducted business with one another, as

4

well as with the leaders and associates of FIFA, throughout the year at locations around the world, including in the United States.

9.    CONCACAF was a continental soccer confederation incorporated in the Bahamas. From approximately 1990 to 2012, CONCACAF's principal administrative office was located in New York, New York, where the former general secretary was based (until the end of 2011) and where CONCACAF regularly conducted business. Beginning in 2012, CONCACAF's principal administrative office was located in Miami, Florida, where the new general secretary was based. CONCACAF also conducted business at various times throughout the United States, including in the Eastern District of New York, as well as in foreign countries within and outside the confederation. CONCACAF comprised as many as 41 member associations, representing organized soccer in North America, Central America, the Caribbean and three South American countries. The United States and two of its overseas territories, Puerto Rico and the United States Virgin Islands, were members of CONCACAF. Among other tournaments, CONCACAF organized the Gold Cup, featuring the men's national teams from CONCACAF and, from time to time, other confederations, as well as a tournament featuring the top men's professional league—or club—teams. In 2014, CONCACAF adopted a code of ethics that, among other things, prohibited bribery and corruption.

10.    CONMEBOL was a continental soccer confederation headquartered in Paraguay. CONMEBOL comprised as many as 10 member associations, representing organized soccer in South America. Among other tournaments, CONMEBOL organized the Copa América, featuring the men's national teams of its 10 members and non-CONMEBOL

5

national teams invited to participate, as well as tournaments featuring the top men's club teams. In 2016, the United States hosted and participated in a special edition of the tournament, the Copa América Centenario, to commemorate its centennial. In 2013, CONMEBOL adopted a code of ethics that, among other things, prohibited bribery and corruption.

11. UEFA was a continental soccer confederation headquartered in Switzerland that represented organized soccer in Europe and certain nations in the Middle East and Central Asia. CAF was a continental soccer confederation headquartered in Egypt that represented organized soccer in Africa. AFC was a continental soccer confederation headquartered in Malaysia that represented organized soccer in Asia, as well as the island of Guam, an overseas territory of the United States. OFC was a continental soccer confederation headquartered in New Zealand that represented organized soccer in New Zealand and the Pacific Island countries, including American Samoa, an overseas territory of the United States.

12. The six confederations organized World Cup qualifying matches and other regional soccer events and, from time to time, worked together to organize inter-confederation competitions, often with the support and approval of FIFA.

C. The Regional Federations and National Associations

13. In addition to being members of FIFA and their respective continental confederations, some of the national associations were also members of smaller, regional federations.

14.     For example, CONCACAF's member associations were organized into three smaller regional federations: the Caribbean Football Union ("CFU"), the Central American Football Union ("UNCAF") and the North American Football Union ("NAFU"). The United States Soccer Federation ("USSF") was thus a member association of CONCACAF as well as NAFU, while Puerto Rico and the United States Virgin Islands were both members of CONCACAF and CFU.

15.     The national associations, also often referred to as "federations," promoted, organized and governed soccer, often including club-level soccer, within individual nations.  The national association of the United States, the USSF, was based in Chicago, Illinois.

16.     The national associations also worked together to organize exhibition soccer matches between national and club teams, known as "friendlies."  Friendlies took place in venues throughout the United States, including the Eastern District of New York, as well as in other locations worldwide.

D.     The Sports Marketing Companies

17.     FIFA, the continental confederations, the regional federations and the national member associations often entered into contracts with sports marketing companies to commercialize the media and marketing rights to various soccer events, including the World Cup and other tournaments, World Cup and Olympic qualifiers, friendlies and other events, as well as other rights associated with the sport.  Often operating in coordination with affiliated consultants and intermediaries, these sports marketing companies, including multinational corporations with headquarters, offices or affiliates located in the United

7

States, often acquired an array of media and marketing rights, including television and radio broadcasting rights, advertising rights, sponsorship rights, licensing rights, hospitality rights and ticketing rights. These sports marketing companies often sold these rights to, among others, television and radio broadcast networks, sponsors and sub-licensees, including those located in the United States.

18.     The revenue generated by the commercialization of the media and marketing rights associated with soccer constituted an essential source of revenue for the enterprise. The United States was an increasingly important and lucrative market for the commercialization of these rights.

## II.     The Defendants

19.     The defendants HUGO JINKIS and MARIANO JINKIS, both citizens of Argentina, were individuals employed by and associated with the enterprise. HUGO JINKIS was the father of MARIANO JINKIS. At various times relevant to the Indictment, HUGO JINKIS and MARIANO JINKIS were the owners and controlling principals of the defendant FULL PLAY GROUP S.A. ("FULL PLAY"), a sports media and marketing business incorporated in Uruguay that operated from a principal office in Buenos Aires, Argentina. HUGO JINKIS and MARIANO JINKIS also controlled subsidiaries and formal and informal affiliates of FULL PLAY, including, among others, Bayan S.A., Cross Trading S.A. and Yorkfields S.A.

20.     The defendant FULL PLAY was a member of, and was associated with, the enterprise. FULL PLAY had two shareholders, defendants HUGO JINKIS and MARIANO JINKIS, each of whom owned 50% of FULL PLAY.

21.     The defendant HERNAN LOPEZ, a citizen of the United States and Argentina, was an individual associated with the enterprise.  At various times relevant to the Indictment, LOPEZ was the Chief Executive Officer of Fox International Channels ("FIC"), a subsidiary of Twenty-First Century Fox, Inc. ("Fox") responsible for, among other things, developing Fox's sports broadcasting businesses in Latin America.

22.     The defendant CARLOS MARTINEZ, a citizen of the United States and Mexico, was an individual associated with the enterprise.  At various times relevant to the Indictment, MARTINEZ was the President of FIC, Latin America, and a high-ranking executive of Fox Latin American Channel, Inc., an affiliate of FIC that, among other things, developed and carried out aspects of Fox's sports broadcasting operations in Latin America.

23.     The defendant GERARD ROMY, a citizen of Spain, was an individual employed by and associated with the enterprise.  At various times relevant to the Indictment, ROMY was a high-ranking executive and shareholder of Imagina Audiovisual SL ("Imagina"), a privately held, multinational media conglomerate based in Barcelona, Spain, that owned various subsidiaries in Spain and around the world, including a majority share of the business units of US Imagina, LLC, based in Miami, Florida, which engaged in a variety of media activities primarily in the United States and Latin America, including television production.  Through his partial ownership of Imagina, ROMY was a stakeholder in Media World, LLC (together with its successor entities, "Media World"), a sports marketing company based in Miami that was a subsidiary of US Imagina, LLC.

24.     The defendant ARIEL ALVARADO, a citizen of Panama, was an individual employed by and associated with the enterprise.  In or about and between 2004

9

and 2012, ALVARADO was the president of the Federación Panamena de Futbol ("FEPAFUT"), the Panamanian soccer federation, which was a national member association of FIFA, CONCACAF and UNCAF. At various times relevant to the Indictment, ALVARADO was a member of the CONCACAF executive committee and the FIFA disciplinary committee.

25.     The defendant MANUEL BURGA, a citizen of Peru, was an individual employed by and associated with the enterprise. In or about and between 2002 and 2014, BURGA was the president of Federación Peruana de Fútbol, the Peruvian soccer federation, which was a national member association of FIFA and CONMEBOL. At various times relevant to the Indictment, BURGA also served on one or more FIFA standing committees.

26.     The defendant LUÍS CHIRIBOGA, a citizen of Ecuador, was an individual employed by and associated with the enterprise. In or about and between 1998 and 2015, CHIRIBOGA was the president of Federación Ecuatoriana de Fútbol, the Ecuadorian soccer federation, which was a national member association of FIFA and CONMEBOL. At various times relevant to the Indictment, CHIRIBOGA was also a member of the CONMEBOL executive committee.

27.     The defendant MARCO POLO DEL NERO, a citizen of Brazil, was an individual employed by and associated with the enterprise. In or about and between April and December 2015, DEL NERO was the president of the Confederação Brasileira de Futebol ("CBF"), the Brazilian soccer federation, which was a national member association of FIFA and CONMEBOL. In or about and between 2012 and 2015, DEL NERO was also a member of FIFA's executive committee. At various times relevant to the Indictment, DEL

10

NERO was also a member of multiple FIFA standing committees, including the organizing committee for the Olympic football tournaments, for which he served as chairman, and the organizing committee for the World Cup, for which he served as deputy chairman.

28.    The defendant EDUARDO DELUCA, a citizen of Argentina, was an individual employed by and associated with the enterprise. In or about and between 1986 and 2011, DELUCA was the general secretary of CONMEBOL.

29.    The defendant EUGENIO FIGUEREDO, a citizen of the United States and Uruguay, was an individual employed by and associated with the enterprise. In or about and between 2013 and 2015, FIGUEREDO was a member of FIFA's executive committee and a FIFA vice president. At various times relevant to the Indictment, FIGUEREDO was also a member of multiple FIFA standing committees, including the finance committee and the organizing committee for the World Cup. In or about and between 2013 and 2014, FIGUEREDO was the CONMEBOL president; prior to that, he was one of CONMEBOL's vice presidents. In or about and between 1997 and 2006, FIGUEREDO was the president of the Asociación Uruguaya de Fútbol, the Uruguayan soccer federation, which was a national member association of FIFA and CONMEBOL.

30.    The defendant JOSÉ LUÍS MEISZNER, a citizen of Argentina, was an individual employed by and associated with the enterprise. In or about and between 2012 and 2015, MEISZNER was the general secretary of CONMEBOL. Previously, MEISZNER was the general secretary of the Asociación del Futbol Argentina ("AFA"), the Argentine soccer federation, which was a national member association of FIFA and CONMEBOL.

31.     The defendant ROMER OSUNA, a citizen of Bolivia, was an individual employed by and associated with the enterprise.  In or about and between 1986 and 2013, OSUNA was the treasurer of CONMEBOL.  At various times relevant to the Indictment, OSUNA was a member of the FIFA audit and compliance committee.

32.     The defendant RICARDO TEIXEIRA, a citizen of Brazil, was an individual employed by and associated with the enterprise.  In or about and between 1989 and 2012, TEIXEIRA was the president of CBF, the Brazilian soccer federation.  In or about and between 1994 and 2012, TEIXEIRA was also a member of FIFA's executive committee.

33.     The defendant REYNALDO VASQUEZ, a citizen of El Salvador, was an individual employed by and associated with the enterprise.  At various times relevant to the Indictment, VASQUEZ was the president of the Federación Salvadoreña de Futbol ("FESFUT"), the Salvadoran soccer federation, which was a national member association of FIFA, CONCACAF and UNCAF.

34.     The defendant JACK WARNER, a citizen of Trinidad and Tobago and, in or about and between 1993 and 2013, a legal permanent resident of the United States, was an individual employed by and associated with the enterprise.  In or about and between 1983 and 2011, WARNER was a member of the FIFA executive committee and, beginning in 1997, was also a FIFA vice president.  In or about and between 1990 and 2011, WARNER was also the president of CONCACAF and CFU, as well as a "special advisor" to the Trinidad and Tobago Football Federation, a national member association of FIFA, CONCACAF and the CFU.

III.     The Defendants' Co-Conspirators

A.     Named Co-Conspirators

35.     The following individuals and business entities, among others, were the defendants' co-conspirators:

36.     At various times relevant to the Indictment, Luis Bedoya was the president of Federación Colombiana de Fútbol, the Colombian soccer federation, which was a national member association of FIFA and CONMEBOL.  At various times relevant to the Indictment, Bedoya was also a member of the FIFA and CONMEBOL executive committees.

37.     At various times relevant to the Indictment, Alejandro Burzaco was a principal of Torneos y Competencias S.A., a sports media and marketing business headquartered in Argentina.  Burzaco also controlled a number of subsidiaries and formal and informal affiliates of Torneos y Competencias S.A., including Productora de Eventos S.A., as well as shell entities created to effect certain transactions with and on behalf of Torneos y Competencias S.A.  These companies are referred to collectively below as "Torneos."

38.     At various times relevant to the Indictment, Carlos Chávez was the president of Federación Boliviana de Fútbol, the Bolivian soccer federation, which was a national member association of FIFA and CONMEBOL.

39.     At various times relevant to the Indictment, Zorana Danis was the controlling principal of International Soccer Marketing, Inc. ("ISM"), a company engaged in

the purchase and sale of sponsorship and other commercial rights to soccer events. ISM was headquartered in Jersey City, New Jersey.

40. At various times relevant to the Indictment, Aaron Davidson was a high-level executive, including the president, of Traffic Sports USA, Inc. ("Traffic USA"), which was part of the Traffic Group, a multinational sports marketing conglomerate based in Brazil. Traffic USA was headquartered in Miami, Florida and was involved in the purchase and sale of media and marketing rights associated with soccer in the United States and other parts of the CONCACAF region.

41. At various times relevant to the Indictment, José Hawilla was the founder and owner of the Traffic Group. The Traffic Group comprised, among other entities, Traffic Assessoria e Comunicações S/C Ltda. ("Traffic Brazil"), Traffic Sports International, Inc. ("Traffic International"), Traffic USA, Traffic Sports Europe B.V. and Continental Sports International, Inc. (referred to collectively herein as "Traffic" or the "Traffic Group"). At various times relevant to the Indictment, Traffic's operations focused on, among other things, the commercialization of soccer in South America through the purchase and sale of media and marketing rights associated with the sport.

42. At various times relevant to the Indictment, Alfredo Hawit was the general secretary, and then president, of Federación Nacional Autonoma de Futbol de Honduras, the Honduran soccer federation, which was a national member association of FIFA and CONCACAF. At various times relevant to the Indictment, Hawit was the president of CONCACAF, acting president of CONCACAF and a member of the

14

CONCACAF executive committee.  At various times relevant to the Indictment, Hawit was a FIFA vice president serving on the FIFA executive committee.

43.     At various times relevant to the Indictment, Roger Huguet was a high-ranking executive and part owner of Media World, a sports marketing company based in Miami, Florida, and its parent company, US Imagina, LLC, which engaged in a variety of media activities primarily in the United States and Latin America, including television production.

44.     At various times relevant to the Indictment, Sergio Jadue was the president of Asociación Nacional de Fútbol Profesional de Chile, the Chilean soccer federation, which was a national member association of FIFA and CONMEBOL.  At various times relevant to the Indictment, Jadue was a vice president of CONMEBOL.

45.     At various times relevant to the Indictment, Nicolás Leoz was the president of CONMEBOL and a member of FIFA's executive committee.

46.     At various times relevant to the Indictment, José Margulies was a controlling principal of Valente Corp. ("Valente") and Somerton Ltd. ("Somerton"), South American companies registered in Panama and Turks and Caicos, respectively.

47.     At various times relevant to the Indictment, José Maria Marin was the president of CBF, the Brazilian soccer federation.

48.     At various times relevant to the Indictment, Juan Ángel Napout was the president of the Asociación Paraguaya de Fútbol, the Paraguayan soccer federation, and the CONMEBOL president.  In addition, in or about and between May and December 2015, Napout was a member of FIFA's executive committee and a FIFA vice president.

49.     At various times relevant to the Indictment, Rafael Salguero was the president of the Federación Nacional de Futbol de Guatemala, the Guatemalan soccer federation, and a member of the FIFA executive committee.

50.     At various times relevant to the Indictment, Costas Takkas was the general secretary of the Cayman Islands Football Association ("CIFA"), a national member association of FIFA and CONCACAF, and was also an attaché to the CONCACAF president after Jeffrey Webb assumed that role.

51.     At various times relevant to the Indictment, Fabio Tordin was employed in the finance department of Traffic Brazil and later served as the chief executive officer of Traffic USA in Miami, Florida.  At various times relevant to the Indictment, Tordin was also an executive of Media World.

52.     At various times relevant to the Indictment, Miguel Trujillo was an employee of Traffic USA and then a consultant, residing in South Florida, specializing in negotiating soccer media and marketing rights, principally with certain CONCACAF member associations.

53.     At various times relevant to the Indictment, Jeffrey Webb was the president of CIFA, a member of the CFU executive committee, the chairman of CFU's normalization committee, the president of CONCACAF and a FIFA vice president and executive committee member.

B.      Unnamed Co-Conspirators

54.      The identities of the following individuals are known to the Grand

Jury:

55.      At various times relevant to the Indictment, Co-Conspirator #1 was a

high-ranking official of FIFA, CONMEBOL and AFA, the Argentinian soccer federation,

which was a national member association of FIFA and CONMEBOL.

56.      At various times relevant to the Indictment, Co-Conspirator #2 was a

high-ranking official of FIFA and AFC, the regional confederation representing much of

Asia.

57.      At various times relevant to the Indictment, Co-Conspirator #3 was a

close advisor to the president of FIFA and other high-ranking FIFA officials.

58.      At various times relevant to the Indictment, Co-Conspirator #4 was a

high-ranking FIFA official.

* * * *

59.      The foregoing officials of FIFA, CONCACAF, CONMEBOL and other

soccer governing bodies were bound by fiduciary duties to each of their respective

organizations.

IV.      The Conspirators' Corruption of the Enterprise

60.      Certain individuals and entities employed by or associated with the

enterprise, including the defendants HUGO JINKIS, MARIANO JINKIS, FULL PLAY,

HERNAN LOPEZ, CARLOS MARTINEZ, GERARD ROMY, ARIEL ALVARADO,

MANUEL BURGA, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO

17

DELUCA, EUGENIO FIGUEREDO, JOSÉ LUÍS MEISZNER, ROMER OSUNA,

RICARDO TEIXEIRA, REYNALDO VASQUEZ and JACK WARNER, together with

others, conspired to use their positions to engage in schemes involving the solicitation, offer,

acceptance, payment and receipt of undisclosed and illegal payments, bribes and kickbacks.

Although the defendants and their co-conspirators also helped pursue the principal purpose

of the enterprise, the defendants and their co-conspirators corrupted the enterprise by

engaging in various criminal activities, including fraud, bribery and money laundering, in

pursuit of personal and commercial gain.  The conspirators also participated in the corruption

of the enterprise by conspiring with and aiding and abetting their co-conspirators in the abuse

of their positions of trust and the violation of their fiduciary duties.

      61.    To further their corrupt ends, the defendants and their co-conspirators

provided one another with mutual aid and protection.  The conspirators engaged in conduct

designed to prevent the detection of their illegal activities, to conceal the location and

ownership of proceeds of those activities and to promote the carrying on of those activities.

The conduct engaged in by various members of the conspiracy included, among other things:

the use of sham contracts, invoices and payment instructions designed to create an

appearance of legitimacy for illicit payments; the use of various mechanisms, including

trusted intermediaries, bankers, financial advisors and currency dealers, to make and

facilitate the making of illicit payments; the creation and use of shell companies, nominees

and numbered bank accounts in tax havens and other secretive banking jurisdictions; the

active concealment of foreign bank accounts; the use of cash; the purchase of real property

and other physical assets; and obstruction of justice. Within the United States, such conduct took place within the Eastern District of New York and elsewhere.

62. The damage inflicted by the defendants and their co-conspirators was far-reaching. By conspiring to enrich themselves through bribery and kickback schemes relating to the sale of media and marketing rights to various soccer tournaments and events, among other schemes, the defendants deprived FIFA, the confederations and their constituent organizations—and, therefore, the national member associations, national teams, youth leagues and development programs that relied on financial support from their parent organizations—of the full value of those rights. In addition, the schemes had powerful anti-competitive effects, distorting the market for the commercial rights associated with soccer and undermining the ability of other sports marketing companies to compete for such rights on terms more favorable to the rights-holders. Finally, the schemes deprived FIFA, the confederations and their constituent organizations of their right to the honest and loyal services of the soccer officials involved. Over time, and in the aggregate, such deprivations inflicted significant reputational harm on the victimized institutions, damaging their prospects for attracting conscientious members and leaders and limiting their ability to operate effectively and carry out their core missions.

V.     Overview of the Racketeering Conspiracy

63. Over a period of more than 20 years, the defendants and their co-conspirators corrupted the enterprise through, among other things, the solicitation, payment and receipt of bribes and kickbacks in connection with the sale of media and marketing rights to various soccer tournaments and events. As the defendants and their co-conspirators rose

19

to positions of power and influence in the world of organized soccer, a network of marketing

companies developed to capitalize on the expanding media market for the sport, particularly

in the United States.  Over time, the organizations responsible for promoting and governing

soccer in regions and localities throughout the world, including the United States, became

increasingly intertwined with one another and with the sports media and marketing

companies that generated enormous profits through the sale and downstream

commercialization of media rights to soccer tournaments and events.  The corruption of the

enterprise arose and flourished in this context.

      64.    The conspirators relied heavily on the United States legal and financial

systems, including the wire facilities of the United States, in connection with their corruption

of the enterprise.  This reliance—both on specific U.S. financial institutions and the broader

strength and stability of the U.S. financial system—was significant and sustained and was

one of the central methods and means through which the conspirators carried out, promoted

and concealed their schemes.

VI.    <u>Criminal Schemes</u>

      65.    The defendants and their co-conspirators agreed to various criminal

schemes involving the solicitation, offer, acceptance, payment and receipt of bribes and

kickbacks in connection with the purchase and sale of media and marketing rights, including,

but not limited to: the rights held by CONMEBOL for the Copa América and Copa

Libertadores; the rights to broadcast certain editions of the World Cup in particular

territories; and the rights to World Cup qualifier matches and friendly matches held by

certain national federation members of CONCACAF and CONMEBOL.  The criminal

schemes also involved the offer, solicitation and receipt of bribes and kickbacks and the embezzlement of funds in connection with, among other things, site selection for World Cup tournaments.

66.     Set forth below are further details regarding certain criminal schemes in which the defendants and their co-conspirators agreed to engage.

A.     CFU World Cup Qualifiers Scheme #1

67.     At various times relevant to the Indictment, the media rights to matches played by national teams seeking to qualify for the World Cup were owned by the home team for each qualifier match.  In negotiating the sale of these rights, CFU member associations agreed to pool their "home team" rights.  In or about and between 1998 and May 2011, the defendant JACK WARNER, as president of CFU, was responsible for negotiating the sale of the CFU member associations' rights with sports marketing companies, including with Traffic USA.  During the same period, WARNER also purported to be a "special advisor" to TTFF, the Trinidadian federation.

68.     Beginning in or about 1998, CFU entered into contracts with Traffic USA for the sale of its members' rights to their home World Cup qualifier matches.  For the contracts for the qualifier matches in advance of the 2002, 2006, 2010 and 2014 World Cups, CFU's negotiations regarding each of these contracts were controlled by the defendant JACK WARNER, and WARNER signed each of these contracts on behalf of CFU.  Beginning with at least the 2006 World Cup qualifiers contract, the contracts stated that they included the sale of media rights owned by all CFU member associations, including TTFF.

69.     Separately, at the defendant JACK WARNER's request, Traffic USA executives created other documents purporting to be contracts with TTFF for the same rights Traffic USA had purchased as part of its deal with CFU (the "TTFF Sham Contracts"). Using the title "special advisor" to TTFF, WARNER signed the TTFF Sham Contracts at approximately the same time as each of the CFU contracts.  Upon WARNER's request, Traffic USA executives subsequently wired payments on the TTFF Sham Contracts from, among others, an account at Citibank in Miami, Florida to accounts controlled by WARNER as bribe payments to WARNER in exchange for the award and execution of the contracts for the rights to the CFU World Cup qualifier matches.

B.     Copa Libertadores Schemes

70.     Beginning in or about 2008 and continuing thereafter through 2012, Zorana Danis, operating through ISM, the New Jersey-based sports marketing company that Danis founded and owned, agreed to make and did make bribe payments to the defendant EDUARDO DELUCA to, among other things, obtain and retain for ISM and associated entities the sponsorship rights associated with the Copa Libertadores, a tournament featuring the top men's club teams from each of CONMEBOL's member federations, and the ability to commercialize those rights.  At various times relevant to the Indictment, Danis also paid bribes to Nicolás Leoz for the same purpose.

71.     The television broadcasting rights to the Copa Libertadores were held, prior to 1999, by the individual teams that competed in the tournament.  In or about 1999, CONMEBOL acquired and consolidated the broadcasting rights to the tournament to

maximize the collective value of the rights, ostensibly for the benefit of both CONMEBOL and the competing teams.

72.     In or about and between 1999 and 2015, T&T Sports Marketing Ltd. ("T&T"), which began as a joint venture between Torneos and Traffic, acquired the exclusive worldwide broadcasting rights to each edition of the Copa Libertadores to be played through 2018 through a series of contracts between T&T and CONMEBOL. T&T was ultimately owned in part by Torneos and in part by other partners, including, in or about and between 2002 and 2015, Fox Pan American Sports ("FPAS"), a Delaware company headquartered in the United States that was, variously, a Fox affiliate and subsidiary.

73.     At various times in or about and between 2005 and 2015, Alejandro Burzaco and the defendants HUGO JINKIS, MARIANO JINKIS, FULL PLAY, HERNAN LOPEZ and CARLOS MARTINEZ, together with others, agreed to pay, did pay and facilitated the concealment of annual bribe and kickback payments to certain high-ranking CONMEBOL officials, including Luis Bedoya, Carlos Chávez, Rafael Esquivel, Sergio Jadue, José Maria Marin and Juan Ángel Napout, as well as to the defendants MANUEL BURGA, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, EUGENIO FIGUEREDO, JOSÉ LUIS MEISZNER, ROMER OSUNA and RICARDO TEIXEIRA, in exchange for the officials' support of T&T as the holder of the rights to the Copa Libertadores and other soccer events.

74.     The defendants HERNAN LOPEZ and CARLOS MARTINEZ, together with others, relied on loyalty secured through the payment of bribes to certain CONMEBOL officials in connection with the Copa Libertadores to advance the business

23

interests of Fox beyond the Copa Libertadores, including by obtaining confidential information from Co-Conspirator #1 regarding bidding for the rights to broadcast the 2018 and 2022 World Cup tournaments in the United States.

C.     UNCAF Region World Cup Qualifiers Schemes

75.     Like CFU members, UNCAF members sought to sell the media rights they owned to home team matches played to qualify for the World Cup.  Unlike CFU, the UNCAF members did not pool their rights; instead, the UNCAF member federations negotiated separately with prospective purchasers of the rights, which included Traffic USA and Media World.

76.     From in or about the late 1990s to in or about 2006, Traffic USA obtained contracts for the rights to the World Cup qualifier matches held by most or all of the UNCAF federations.  Beginning in or about 2005, Media World began to compete with Traffic USA for these rights.  In or about the spring of 2012, Media World and Traffic USA agreed to pool their resources and share both costs expended and revenue earned from the purchase of rights to World Cup qualifier matches played by all CONCACAF member associations, including those in UNCAF.

77.     Throughout this period—both while Traffic USA and Media World were competitors and after they entered into a revenue-sharing agreement—representatives of the two companies agreed to pay, and did pay, bribes to numerous UNCAF federation officials and former UNCAF federation officials who retained influence over those federations to obtain contracts for World Cup qualifier rights.  The sports marketing

executives and consultants who participated in this scheme included, among others, the defendant GERARD ROMY, as well as Roger Huguet, Fabio Tordin and Miguel Trujillo.

78.     Roger Huguet regularly apprised the defendant GERARD ROMY of the bribes paid on behalf of Media World to officials of UNCAF federations to secure the rights to these federations' World Cup qualifier matches.  Huguet and ROMY also discussed the fact that Media World had taken steps to conceal the true nature and purpose of bribe payments made in furtherance of the scheme, including by disguising those payments as fees payable pursuant to purported "consulting" contracts.  ROMY agreed to and approved Media World's participation in the scheme.  The officials who agreed to accept, and did accept, bribes in connection with this scheme included, among others, the defendants ARIEL ALVARADO and REYNALDO VASQUEZ.

D.     The CONMEBOL World Cup Qualifiers/Friendlies Scheme

79.     In or about and between 2007 and 2015, the defendants HUGO JINKIS, MARIANO JINKIS and FULL PLAY engaged in a scheme to pay bribes and kickbacks in connection with certain World Cup qualifying matches and certain friendly matches to the presidents of various soccer federations within CONMEBOL in exchange for the officials' support of FULL PLAY as the holder of the media rights to broadcast those and other soccer events.  The scheme included the payment of bribes and kickbacks to, among other soccer officials, Luis Bedoya, Carlos Chávez, Rafael Esquivel, Sergio Jadue and Juan Ángel Napout, as well as the defendant LUÍS CHIRIBOGA.

E.     Copa América Schemes

80.     For many years leading up to and through 2011, Traffic held the media

and marketing rights to each edition of the Copa América, a tournament featuring the men's

national teams of CONMEBOL's member federations.  At various times during that period,

Traffic, through Hawilla and other conspirators, agreed to make and did make bribe

payments to high-ranking CONMEBOL officials in exchange for continued official support

of Traffic's position as exclusive holder of the media and marketing rights to the tournament.

81.     In or about 2010, CONMEBOL and the defendant FULL PLAY

entered into an agreement pursuant to which FULL PLAY was designated as CONMEBOL's

exclusive agent for the commercialization of the media and marketing rights to the 2015,

2019 and 2023 editions of the Copa América, among other tournaments.  The defendants

FULL PLAY, HUGO JINKIS and MARIANO JINKIS, among others, agreed to pay bribes

to various CONMEBOL officials in exchange for CONMEBOL's entry into the 2010

agreement with FULL PLAY.

82.     Traffic, alleging that the 2010 agreement between CONMEBOL and

the defendant FULL PLAY violated a contract between CONMEBOL and Traffic, filed a

lawsuit in Florida state court against CONMEBOL, FULL PLAY and others.  In the months

preceding a 2013 settlement of that lawsuit, FULL PLAY (through HUGO JINKIS and

MARIANO JINKIS), Traffic (through José Hawilla) and Torneos (through Alejandro

Burzaco) agreed that FULL PLAY, Traffic and Torneos would jointly acquire commercial

rights to the Copa América in exchange for an agreement by Traffic to resolve the lawsuit.

To this end, a new company, Datisa S.A. ("Datisa"), in which FULL PLAY, Traffic and

Torneos each held a one-third interest, was created for the purpose of jointly obtaining and exploiting the commercial rights to the Copa América.

83.     Datisa, through its shareholders the defendant FULL PLAY, Traffic and Torneos, later entered into a contract with CONMEBOL and FULL PLAY (the "2013 Copa América Contract"). Pursuant to the 2013 Copa América contract, Datisa obtained from CONMEBOL the exclusive worldwide media and marketing rights to the 2015, 2019 and 2023 editions of the tournament and to the Copa América Centenario, which was played in the United States in 2016, for a price of $317.5 million, and CONMEBOL and FULL PLAY assigned to Datisa the related contracts that had already been executed with third parties. The contract was dated May 25, 2013 and signed by representatives of each of Datisa's three shareholders and 12 CONMEBOL officials.

84.     The defendants HUGO JINKIS, MARIANO JINKIS and FULL PLAY, along with, among others, José Hawilla and Alejandro Burzaco, agreed to pay tens of millions of dollars in bribes to CONMEBOL officials in connection with the 2013 Copa América Contract, including bribe payments for contract signature and for each of the four editions of the tournament covered by the contract.

85.     The CONMEBOL officials who were promised and who received bribes in connection with the Copa América included Luis Bedoya, Carlos Chávez, Rafael Esquivel, Sergio Jadue, José Maria Marin, Juan Ángel Napout and Co-Conspirator #1, as well as the defendants MANUEL BURGA, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EUGENIO FIGUEREDO, RICARDO TEIXEIRA and JOSÉ LUÍS MEISZNER. In addition, the conspirators agreed to pay Jeffrey Webb, then president of CONCACAF, a

27

bribe in exchange for Webb's agreement to cause CONCACAF, in its capacity as the co-organizer of the Copa América Centenario, to sell its rights related to the tournament to Datisa.

F.   2010 FIFA World Cup Bribery and Embezzlement Scheme

86.   In or about 2004, the FIFA executive committee considered bids to host the 2010 World Cup from a number of nations, and ultimately voted on bids from Morocco, South Africa and Egypt.  In approximately 2004, high-ranking officials of FIFA and the South African government indicated to the defendant JACK WARNER that they were prepared to arrange for the government of South Africa to pay $10 million to CFU purportedly to "support the African diaspora" but in fact to secure the votes of WARNER and other CONCACAF representatives on the FIFA executive committee in favor of South Africa as host of the 2010 tournament.

87.   The South African government was unable to arrange for the $10 million payment to be made directly from government funds.  Instead, arrangements were made with FIFA officials to have the $10 million sent from FIFA—using funds that otherwise would have gone from FIFA to South Africa's World Cup Organizing Committee for use in organizing the tournament—to CFU.

88.   As part of the scheme, on or about January 2, 2008, January 31, 2008 and March 7, 2008, a high-ranking FIFA official, Co-Conspirator #4, caused payments of $616,000, $1,600,000 and $7,784,000—totaling $10 million—to be wired from a FIFA account in Switzerland to a Bank of America correspondent account in New York, New

York, for credit to accounts held in the names of CFU and CONCACAF, but controlled by the defendant JACK WARNER, at Republic Bank in Trinidad and Tobago.

89.     Soon after receiving these wire transfers, the defendant JACK WARNER caused a substantial portion of the funds to be diverted for his personal use. For example, on or about January 9, 2008, WARNER directed Republic Bank officials to apply $200,000 of the $616,000 that had been transferred into a CFU account from FIFA one week earlier toward a personal loan account held in his name. WARNER also diverted a portion of the funds into his personal accounts through intermediaries.

G.     The 2018 and 2022 World Cup Vote Schemes

90.     In or about and between 2009 and 2010, bid committees working on behalf of various nations prepared presentations in support of bids to host either the 2018 or 2022 World Cup. Ultimately, bid committees representing Russia, England, a joint bid by Spain and Portugal and a joint bid by the Netherlands and Belgium submitted bids to host the 2018 World Cup, and bid committees representing the United States, Qatar, Japan, South Korea and Australia submitted bids to host the 2022 World Cup.

91.     On or about December 2, 2010, in Zurich, Switzerland, the FIFA executive committee selected the host sites for the 2018 and 2022 World Cups, in separate rounds of voting for each edition of the tournament, with each executive committee member casting an equally weighted vote. Under the voting rules, if no bid received a majority of the votes cast, the bid receiving the fewest votes was eliminated and another vote was held. The process was repeated until one bid received an outright majority of the votes. Russia

29

received a majority of votes in the second round of voting for the 2018 World Cup. Qatar received a majority of votes in the fourth round of voting for the 2022 World Cup.

92.    Several executive committee members were offered or received bribes in connection with their votes. For example, the defendant RICARDO TEIXEIRA, Nicolás Leoz and Co-Conspirator #1 were offered and received bribe payments in exchange for their votes in favor of Qatar to host the 2022 World Cup. In addition, the defendant JACK WARNER was promised and received bribe payments totaling $5 million and Rafael Salguero was promised a $1 million bribe in exchange for their votes in favor of Russia to host the 2018 World Cup.

93.    On or about November 1, 2010, in the days before the payments to the defendant JACK WARNER began, WARNER's assistant received an email from an associate of Co-Conspirator #3 stating, among other things, "Kindly advise him that 'what was agreed is what is being done this week' Please also tell him that I am less worried about promises made to be fulfilled on my end than his ability to keep his promise when the time comes. Latter will cause me personally extreme trouble if my dear friend cannot keep his promise."

94.    In or about and between November 2010 and April 2011, the defendant JACK WARNER received a total of approximately $5 million, via more than two dozen separate wire transfers, to an account he controlled at Republic Bank in Trinidad and Tobago in the name of the CFU. The wire transfers were sent from 10 different shell companies, all of which were registered and maintained bank accounts in offshore jurisdictions, including Cyprus, Anguilla and the British Virgin Islands, and were cleared through correspondent

30

accounts located in the United States.  The shell companies used to pay WARNER formed part of a broader network of shell entities used to move money through densely layered transactions between and among offshore accounts.  Several of the accounts used to wire money to WARNER received or sent wire transfers to or from companies based in the United States that performed work on behalf of the 2018 Russia World Cup bid.

95.    On or about April 18, 2011, after the above-referenced wire transfers had been completed, Co-Conspirator #3 sent an email to the defendant JACK WARNER's assistant stating: "The 5 is complete (minus 70 bank charges).  I will need a written confirmation along these lines: 'Dear friend.  The transaction was completed as agreed (total of 5m) and all was received (minus minimal bank charges). Many thanks. J.' "

H.    2011 FIFA Presidential Election Scheme

96.    In or about March 2011, Co-Conspirator #2 declared his candidacy for the FIFA presidential election scheduled for June 1, 2011.  At the time, Co-Conspirator #2 was a high-ranking official of FIFA and AFC.  On or about April 1, 2011, Co-Conspirator #2 sent an email to the defendant JACK WARNER's America Online email account and asked WARNER to organize an extraordinary congress of all of the CONCACAF member associations so that Co-Conspirator #2 could address them regarding his candidacy. Ultimately, WARNER agreed to organize a special meeting of the CFU member associations only, rather than of the entire CONCACAF membership.

97.    The CFU meeting took place on or about May 10 and May 11, 2011 at the Hyatt Regency Hotel in Trinidad and Tobago.  On or about May 10, 2011, Co-Conspirator #2 addressed representatives of the CFU member associations regarding his

candidacy, stating, among other things, that he was seeking their support in the June 1, 2011

FIFA presidential election.  Following Co-Conspirator #2's address, the defendant JACK

WARNER advised the CFU officials that they could pick up a "gift" that afternoon in a

conference room in the hotel.   Inside the conference room, CFU staff members handed each

official an envelope bearing the name of the member association that he represented.  Inside

each envelope was $40,000 in United States currency.

98.    On or about May 12, 2011, an official of a member association of a

United States territory ("Official #1"), whose identity is known to the Grand Jury, flew home

to the United States territory with the $40,000 cash.  The next day, on or about May 13,

2011, Official #1 deposited the $40,000 into a bank account in the United States.

99.    The purpose of the $40,000 payments was to induce officials of the

CFU member associations, including Official #1, to vote for Co-Conspirator #2 in the June 1,

2011 FIFA presidential election.

I.      CONCACAF Media and Marketing Rights Scheme

100.    In or about the fall of 2011, the defendants HUGO JINKIS,

MARIANO JINKIS and FULL PLAY sought to exploit a recent change in leadership at

CONCACAF and win business with the confederation, which had not historically sold media

and marketing rights to FULL PLAY, through the payment of bribes to senior CONCACAF

officials.

101.    During a meeting at the estate of defendants HUGO JINKIS and

MARIANO JINKIS in Punta del Este, Uruguay, the defendant ARIEL ALVARADO,

Alfredo Hawit and Rafael Salguero agreed to use their influence to try to cause CONCACAF

32

to sell media and marketing rights to CONCACAF tournaments, including the Gold Cup, to the defendant FULL PLAY. HUGO JINKIS, MARIANO JINKIS and FULL PLAY agreed to pay and did pay six-figure bribe payments to ALVARADO, Alfredo Hawit and Rafael Salguero in exchange for their support of FULL PLAY's efforts to secure the CONCACAF rights.

102.    In furtherance of this scheme, on or about December 1, 2011, the defendants HUGO JINKIS, MARIANO JINKIS and FULL PLAY caused $450,000 to be wired from an account they controlled at Bank Hapoalim in Zurich, Switzerland, to a correspondent account at Citibank in the United States, for credit to a Citibank account in Panama City, Panama controlled by Miguel Trujillo, who served as an intermediary. Over the course of the next several months, the funds were disbursed to the defendant ARIEL ALVARADO, Alfredo Hawit and Rafael Salguero in the amounts previously agreed.

103.    The defendant ARIEL ALVARADO, together with others, attempted to put the topic of awarding the rights that the defendant FULL PLAY sought on the agenda for the CONCACAF executive committee meeting held in Miami, Florida on or about January 15, 2012. For multiple reasons, including because they believed it premature to discuss the matter and because of exclusivity provisions in existing contracts with other companies, other CONCACAF officials attempted to block ALVARADO's efforts. The conspirators' efforts ultimately were unsuccessful and CONCACAF did not award the rights to FULL PLAY.

J.     UNCAF Region Friendlies Scheme

104.    In or about and between 2009 and 2015, Fabio Tordin and Miguel
Trujillo operated a business venture to organize and promote friendly matches involving the
men's national soccer teams of Costa Rica, El Salvador and Guatemala, as well as friendly
matches involving other FIFA member associations.  The matches were frequently played at
venues in the United States.  To obtain the agreement of the Costa Rican, Salvadoran and
Guatemalan federations to participate in these friendly matches, Tordin and Trujillo agreed
to pay, and did pay, bribes to high-ranking current and former officials of the federations for
Costa Rica, El Salvador and Guatemala, including the defendant REYNALDO VASQUEZ.

K.     CFU World Cup Qualifiers Scheme #2

105.    In or about the spring of 2012, Media World and Traffic USA, which
until that time had been competitors in the market, agreed to pool their resources and share
revenue earned from the purchase of rights to World Cup qualifier matches played by
CONCACAF member associations, including associations within the CFU.  Among others,
the defendant GERARD ROMY participated in the negotiation of the terms of the
partnership.

106.    During these negotiations, the defendant GERARD ROMY learned that
Traffic USA had agreed to pay a $3 million bribe to Jeffrey Webb, then president of CIFA
and a high-ranking CFU official, to obtain the CFU World Cup qualifier rights.  ROMY
agreed on behalf of Media World to split the cost of the bribe payment with Traffic USA,
such that each company would be obligated to pay Webb a $1.5 million bribe.  ROMY
subsequently informed Roger Huguet of the agreement to pay the bribe and of the fact that

Costas Takkas, a close associate of Webb's, would contact Huguet about arranging the payment.

107.    In or about May 2012, CONCACAF elected Jeffrey Webb to be its president.  On or about August 28, 2012, Traffic USA and CFU entered into a $23 million contract for the exclusive worldwide commercial rights for CFU's 2018 and 2022 World Cup qualifier matches.

108.    In or about 2012, to facilitate Media World's payment of its portion of the bribe to Jeffrey Webb, the defendant GERARD ROMY informed Roger Huguet that Media World's payment would be made by Production Company A, a wholly owned subsidiary of an entity affiliated with Imagina in Spain.  ROMY directed Huguet to find an intermediary to receive the payment so as to conceal its true nature and purpose, which Huguet did.

109.    Thereafter, in or about 2013, the defendant GERARD ROMY put Roger Huguet in contact with certain executives of Production Company A and instructed Huguet to arrange for a false invoice to be submitted to Production Company A to conceal the true nature of the payment.  In or about 2014, five- and six-figure payments from Media World were transmitted to Costas Takkas using the wire facilities of the United States.

110.    In or about the winter of 2014-2015, the defendant GERARD ROMY informed Roger Huguet that, due to information ROMY had learned regarding the government's ongoing investigation of José Hawilla, Media World should not make any additional payments toward the $1.5 million bribe it owed to Jeffrey Webb.

*  *  *  *

111.   In the course of the foregoing schemes, the defendants and their co-conspirators used wire facilities and financial institutions located in the United States, among other countries, to make and receive bribe payments and to transfer payments related to contracts secured through bribery.  In the course of the schemes, the conspirators also relied on the growing U.S. market for soccer to generate profits from the schemes and conducted meetings in the United States in furtherance of the schemes.

112.   Apart from disclosure to FIFA of the 2011 FIFA presidential election bribery scheme, no disclosure of any of the foregoing bribery and kickback schemes was made to FIFA, CONCACAF or CONMEBOL, including without limitation to their respective executive committees, congresses or constituent organizations.

<u>COUNT ONE</u>
(Racketeering Conspiracy)

113.   The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

114.   In or about and between 1991 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants HUGO JINKIS, MARIANO JINKIS, FULL PLAY, GERARD ROMY, ARIEL ALVARADO, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, EUGENIO FIGUEREDO, JOSÉ LUÍS MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA, REYNALDO VASQUEZ and JACK WARNER, together with others, being persons employed by and associated with the enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate,

directly and indirectly, in the conduct of the affairs of such enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5).

115.   The pattern of racketeering activity through which the defendants HUGO JINKIS, MARIANO JINKIS, FULL PLAY, GERARD ROMY, ARIEL ALVARADO, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, EUGENIO FIGUEREDO, JOSÉ LUÍS MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA, REYNALDO VASQUEZ and JACK WARNER, together with others, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise consisted of multiple acts indictable under:

a) Title 18, United States Code, Section 1343 (wire fraud, including honest services wire fraud);

b) Title 18, United States Code, Sections 1956 and 1957 (money laundering and money laundering conspiracy);

c) Title 18, United States Code, Section 1952 (interstate and foreign travel in-aid-of racketeering);

d) Title 18, United States Code, Section 1512 (obstruction of justice and obstruction of justice conspiracy); and

multiple acts involving bribery, in violation of New York State Penal Law Sections 180.03 and 180.08 and New Jersey Statute 2C:21-10.  Each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, the last of which would occur within 10 years of a prior act of racketeering activity.

(Title 18, United States Code, Sections 1962(d), 1963 and 3551 et seq.)

## COUNT TWO
(Wire Fraud Conspiracy – CFU World Cup Qualifiers Scheme #1)

116.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

117.    In or about and between 2000 and 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JACK WARNER, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud CFU and its constituent organizations, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers, telephone calls and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNTS THREE AND FOUR
(Wire Fraud – CFU World Cup Qualifiers Scheme #1)

118.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

119.    On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendant JACK WARNER, together with others, did knowingly and intentionally devise a scheme and artifice to defraud CFU and its constituent organizations, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

120.     For the purpose of executing such scheme and artifice, the defendant

JACK WARNER, together with others, did transmit and cause to be transmitted, by means of

wire communication in interstate and foreign commerce, writings, signs, signals, pictures and

sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|--------------|--------------------|
| THREE | December 13, 2010 | Wire transfer of approximately $290,000 from Traffic USA's account at Citibank in Miami, Florida to a Bank of America correspondent account in New York, New York, for credit to an account in the name of CFU at Republic Bank in Trinidad and Tobago. |
| FOUR | February 2, 2011 | Wire transfer of approximately $250,000 from Traffic USA's account at Citibank in Miami, Florida to a Bank of America correspondent account in New York, New York, for credit to an account in the name of CFU at Republic Bank in Trinidad and Tobago. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT FIVE
(Money Laundering Conspiracy – CFU World Cup Qualifiers Scheme #1)

121.     The allegations contained in paragraphs 1 through 112 are realleged

and incorporated as if fully set forth in this paragraph.

122.     In or about and between 2000 and 2011, both dates being approximate

and inclusive, within the Eastern District of New York and elsewhere, the defendant JACK

WARNER, together with others, did knowingly and intentionally conspire to transport,

transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in

the United States to and through places outside the United States and to places in the United

States from and through places outside the United States, with the intent to promote the

39

carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT SIX
(Money Laundering – CFU World Cup Qualifiers Scheme #1)

123.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

124.    In or about and between December 2010 and February 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JACK WARNER, together with others, did knowingly and intentionally transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

COUNT SEVEN
(Wire Fraud Conspiracy – Copa Libertadores Scheme #1)

125.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

126.    In or about and between 2000 and 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant

40

EDUARDO DELUCA, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers, telephone calls and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT EIGHT
(Money Laundering Conspiracy – Copa Libertadores Scheme #1)

127.     The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

128.     In or about and between 2000 and 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant EDUARDO DELUCA, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title

18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT NINE
(Wire Fraud Conspiracy – Copa Libertadores Scheme #2)

129.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

130.    In or about and between 2000 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants HUGO JINKIS, MARIANO JINKIS, FULL PLAY, HERNAN LOPEZ, CARLOS MARTINEZ, MANUEL BURGA, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, EUGENIO FIGUEREDO, JOSÉ LUÍS MEISZNER, ROMER OSUNA and RICARDO TEIXEIRA, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers, telephone calls and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

42

COUNTS TEN THROUGH TWENTY
(Wire Fraud – Copa Libertadores Scheme #2)

131.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

132.    On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendants HUGO JINKIS, MARIANO JINKIS, FULL PLAY, HERNAN LOPEZ, CARLOS MARTINEZ, MANUEL BURGA, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, EUGENIO FIGUEREDO, JOSÉ LUÍS MEISZNER, ROMER OSUNA and RICARDO TEIXEIRA, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

133.    For the purpose of executing such scheme and artifice, the defendants HUGO JINKIS, MARIANO JINKIS, FULL PLAY, HERNAN LOPEZ, CARLOS MARTINEZ, MANUEL BURGA, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, EUGENIO FIGUEREDO, JOSÉ LUÍS MEISZNER, ROMER OSUNA and RICARDO TEIXEIRA did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds as described below:

43

| Count | Approx. Date | Wire Communication |
|-------|--------------|--------------------|
| TEN | March 20, 2015 | Wire transfer of approximately $20,100,000 from Fox Latin American Channel, Inc.'s account at Bank of America from and through New York, New York, for credit to an account in the name of T&T Sports Marketing, Ltd. at Interaudi Bank in Miami, Florida. |
| ELEVEN | March 25, 2015 | Wire transfer of approximately $10,000,000 from an account in the name of T&T Sports Marketing, Ltd. at Interaudi Bank in Miami, Florida, to a Citibank correspondent account in New York, New York, for credit to a CONMEBOL account at Banco Itaú in Paraguay. |
| TWELVE | April 15, 2015 | Wire transfer of approximately $550,000 from an account in the name of Bayan Group S.A. at Bank Hapoalim in Switzerland to a correspondent account at Citibank in New York, New York, for credit to an account in the name of Lisburn Strategies Inc. at Amicorp Bank and Trust Ltd. in Barbados. |
| THIRTEEN | April 20, 2015 | Wire transfer of approximately $5,750,000 from Fox Latin American Channel, Inc.'s account at Bank of America from and through New York, New York, for credit to an account in the name of T&T Sports Marketing, Ltd. at Interaudi Bank in Miami, Florida. |
| FOURTEEN | April 20, 2015 | Wire transfer of approximately $2,000,000 from an account in the name of T&T Sports Marketing, Ltd. at Interaudi Bank in Miami, Florida, to a Citibank correspondent account in New York, New York, for credit to a CONMEBOL account at Banco Itaú in Paraguay. |

| | | |
|---|---|---|
| FIFTEEN | May 8, 2015 | Wire transfer of approximately $1,000,000 from an account in the name of T&T Sports Marketing, Ltd. at Interaudi Bank in Miami, Florida, to a Citibank correspondent account in New York, New York, for credit to a CONMEBOL account at Banco Itaú in Paraguay. |
| SIXTEEN | May 18, 2015 | Wire transfer of approximately $2,500,000 from an account in the name of T&T Sports Marketing, Ltd. at Interaudi Bank in Miami, Florida, to a Citibank correspondent account in New York, New York, for credit to a CONMEBOL account at Banco Itaú in Paraguay. |
| SEVENTEEN | May 21, 2015 | Wire transfer of approximately $6,210,000 from Fox Latin American Channel, Inc.'s account at Bank of America from and through New York, New York, for credit to an account in the name of T&T Sports Marketing, Ltd. at Interaudi Bank in Miami, Florida. |
| EIGHTEEN | May 22, 2015 | Wire transfer of approximately $1,925,000 from an account in the name of Torneos & Traffic Sports Marketing B.V. at ING Bank in the Netherlands to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Valente Corporation at Chase Bank in New York, New York. |
| NINETEEN | May 22, 2015 | Wire transfer of approximately $332,000 from an account in the name of Torneos & Traffic Sports Marketing B.V. at ING Bank in the Netherlands to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Valente Corporation at Chase Bank in New York, New York. |

| TWENTY | May 26, 2015 | Wire transfer of approximately $400,000 from Fox Latin American Channel, Inc.'s account at Bank of America from and through New York, New York, for credit to an account in the name of T&T Sports Marketing, Ltd. at Interaudi Bank in Miami, Florida. |
|---|---|---|

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT TWENTY-ONE
(Money Laundering Conspiracy – Copa Libertadores Scheme #2)

134.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

135.    In or about and between 2000 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants HUGO JINKIS, MARIANO JINKIS, FULL PLAY, HERNAN LOPEZ, CARLOS MARTINEZ, MANUEL BURGA, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, EUGENIO FIGUEREDO, JOSÉ LUÍS MEISZNER, ROMER OSUNA and RICARDO TEIXEIRA, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

46

## COUNT TWENTY-TWO
(Wire Fraud Conspiracy – UNCAF Region World Cup Qualifiers Scheme)

136.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

137.    In or about and between 2008 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants GERARD ROMY, ARIEL ALVARADO and REYNALDO VASQUEZ, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF and national member associations and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers, telephone calls and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNTS TWENTY-THREE AND TWENTY-FOUR
(Wire Fraud – UNCAF Region World Cup Qualifiers Scheme)

138.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as though fully set forth in this paragraph.

139.    On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendants GERARD ROMY and REYNALDO VASQUEZ, together with others, did knowingly and intentionally devise a scheme and artifice to defraud

47

FIFA, CONCACAF and FESFUT and their constituent organizations, including to deprive FIFA, CONCACAF and FESFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

140.     For the purpose of executing such scheme and artifice, the defendants GERARD ROMY and REYNALDO VASQUEZ, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|---|---|---|
| TWENTY-THREE | November 4, 2011 | Wire transfer of approximately $100,000 from Media World's account at Bank of America in Miami, Florida, to a Citibank correspondent account in New York, New York, for credit to an account in the name of FESFUT at Banco Cuscatlan in El Salvador. |
| TWENTY-FOUR | October 10, 2012 | Wire transfer of approximately $350,000 from Media World's account at Bank of America in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account at Banco Citibank in Panama. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT TWENTY-FIVE
(Wire Fraud – UNCAF Region World Cup Qualifiers Scheme)

141.     The allegations contained in paragraphs 1 through 112 are realleged and incorporated as though fully set forth in this paragraph.

142.     On or about the date set forth below, within the Southern District of Florida, the defendants GERARD ROMY and ARIEL ALVARADO, together with others,

48

did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF and FEPAFUT and their constituent organizations, including to deprive FIFA, CONCACAF and FEPAFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

143.    For the purpose of executing such scheme and artifice, the defendants GERARD ROMY and ARIEL ALVARADO, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds as described below:

| Count | Approx. Date | Wire Communication |
|---|---|---|
| TWENTY-FIVE | December 13, 2013 | Wire transfer of approximately $15,000 from Traffic USA's account at Citibank in Miami, Florida for credit to an account in the name of Federación Panamena de Futbol at Banco General in Panama City, Panama. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT TWENTY-SIX
(Money Laundering Conspiracy – UNCAF Region World Cup Qualifiers Scheme)

144.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

145.    In or about and between 2008 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants GERARD ROMY, ARIEL ALVARADO and REYNALDO VASQUEZ, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary

49

instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT TWENTY-SEVEN
(Wire Fraud Conspiracy – CONMEBOL World Cup Qualifiers/Friendlies Scheme)

146.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

147.    In or about and between 2009 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants HUGO JINKIS, MARIANO JINKIS, FULL PLAY and LUÍS CHIRIBOGA, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers, telephone calls and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT TWENTY-EIGHT
(Money Laundering Conspiracy – CONMEBOL World Cup Qualifiers/Friendlies Scheme)

148.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

149.    In or about and between 2009 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants HUGO JINKIS, MARIANO JINKIS, FULL PLAY and LUÍS CHIRIBOGA, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

### COUNT TWENTY-NINE
(Wire Fraud Conspiracy – Copa América Scheme)

150.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

151.    In or about and between 2010 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants HUGO JINKIS, MARIANO JINKIS, FULL PLAY, MANUEL BURGA, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, EUGENIO FIGUEREDO, JOSÉ LUÍS MEISZNER, ROMER OSUNA and RICARDO TEIXEIRA, together with others, did

knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA,

CONCACAF and CONMEBOL and their constituent organizations, including to deprive

FIFA, CONCACAF and CONMEBOL and their constituent organizations of their respective

rights to honest and faithful services through bribes and kickbacks, and to obtain money and

property by means of materially false and fraudulent pretenses, representations and promises,

and for the purpose of executing such scheme and artifice, to transmit and cause to be

transmitted by means of wire communication in interstate and foreign commerce, writings,

signs, signals, pictures and sounds, to wit: wire transfers, telephone calls and emails, contrary

to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 <u>et</u> <u>seq</u>.)

COUNTS THIRTY THROUGH THIRTY-FIVE
(Wire Fraud – Copa América Scheme)

152.    The allegations contained in paragraphs 1 through 112 are realleged

and incorporated as if fully set forth in this paragraph.

153.    On or about the dates set forth below, within the Eastern District of

New York and elsewhere, the defendants HUGO JINKIS, MARIANO JINKIS, FULL

PLAY, MANUEL BURGA, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO

DELUCA, EUGENIO FIGUEREDO, JOSÉ LUÍS MEISZNER, ROMER OSUNA and

RICARDO TEIXEIRA, together with others, did knowingly and intentionally devise a

scheme and artifice to defraud FIFA, CONCACAF and CONMEBOL and their constituent

organizations of their respective rights to honest and faithful services through bribes and

kickbacks, and to obtain money and property by means of materially false and fraudulent

pretenses, representations and promises.

52

154.   For the purpose of executing such scheme and artifice, the defendants HUGO JINKIS, MARIANO JINKIS, FULL PLAY, MANUEL BURGA, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, EUGENIO FIGUEREDO, JOSÉ LUÍS MEISZNER, ROMER OSUNA and RICARDO TEIXEIRA, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds as described below:

| Count | Approx. Date | Wire Communication |
| --- | --- | --- |
| THIRTY | April 27, 2015 | Wire transfer of approximately $377,478 from an account in the name of Datisa S.A. at Bank Hapoalim in Switzerland to a correspondent account at Citibank in New York, New York, for credit to an account in the name of Traffic Sports International, Inc. at Itau Unibanco S.A. in the Bahamas. |
| THIRTY-ONE | May 8, 2015 | Wire transfer of approximately $7,200,000 from an account in the name of Sports Marketing Company A, an entity the identity of which is known to the Grand Jury, at Barclays Bank in London, England to a correspondent account at Citibank in New York, New York, for credit to an account in the name of Datisa S.A. at Bank Hapoalim in Switzerland. |
| THIRTY-TWO | May 12, 2015 | Wire transfer of approximately $20,000,000 from an account in the name of Datisa S.A. at Bank Hapoalim in Switzerland to a correspondent account at Citibank in New York, New York, for credit to a CONMEBOL account at Banco Itau in Paraguay. |
| THIRTY-THREE | May 15, 2015 | Wire transfer of approximately $1,000,000 from an account in the name of Major Satellite Broadcasting Company A, an entity the identity of which is known to the Grand Jury, at Bank of America in New York, New York to a correspondent account at Citibank in New York, New York, for credit to an account in the name of Datisa S.A. at Bank Hapoalim in Switzerland. |

| | | |
|---|---|---|
| THIRTY-FOUR | May 20, 2015 | Wire transfer of approximately $1,100,000 from an account in the name of Major Satellite Broadcasting Company A at Bank of America in New York, New York to a correspondent account at Citibank in New York, New York, for credit to an account in the name of Datisa S.A. at Bank Hapoalim in Switzerland. |
| THIRTY-FIVE | May 26, 2015 | Wire transfer of approximately $2,000,000 from an account in the name of Brazilian Broadcasting Company A, an entity the identity of which is known to the Grand Jury, at HSBC Bank in or from New York, New York to a correspondent account at Citibank in New York, New York, for credit to an account in the name of Datisa S.A. at Bank Hapoalim in Switzerland. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

<u>COUNT THIRTY-SIX</u>
(Money Laundering Conspiracy – Copa América Scheme)

155.   The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

156.   In or about and between 2010 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants HUGO JINKIS, MARIANO JINKIS, FULL PLAY, MANUEL BURGA, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, EUGENIO FIGUEREDO, JOSÉ LUÍS MEISZNER, ROMER OSUNA and RICARDO TEIXEIRA, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful

activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all

contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT THIRTY-SEVEN
(Wire Fraud Conspiracy – 2011 FIFA Presidential Election Scheme)

157.    The allegations contained in paragraphs 1 through 112 are realleged

and incorporated as if fully set forth in this paragraph.

158.    In or about and between April 2011 and July 2011, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant JACK WARNER, together with others, did knowingly and intentionally conspire

to devise a scheme and artifice to defraud FIFA, CONCACAF and CFU and their constituent

organizations, including to deprive FIFA, CONCACAF and CFU and their constituent

organizations of their respective rights to honest and faithful services through bribes and

kickbacks, and to obtain money and property by means of materially false and fraudulent

pretenses, representations and promises, and for the purpose of executing such scheme and

artifice, to transmit and cause to be transmitted by means of wire communication in interstate

and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers,

emails and telephone calls, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT THIRTY-EIGHT
### (Money Laundering Conspiracy – 2011 FIFA Presidential Election Scheme)

159.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

160.    In or about and between April 2011 and July 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JACK WARNER, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: United States currency and wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT THIRTY-NINE
### (Wire Fraud Conspiracy – CONCACAF Media and Marketing Rights Scheme)

161.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

162.    In or about and between November 2011 and April 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ARIEL ALVARADO, HUGO JINKIS and MARIANO JINKIS, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONCACAF and their constituent organizations, including to deprive FIFA and

CONCACAF, and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: email messages, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNTS FORTY AND FORTY-ONE<br>(Wire Fraud – CONCACAF Media and Marketing Rights Scheme)

163.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as though fully set forth in this paragraph.

164.    On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendants ARIEL ALVARADO, HUGO JINKIS and MARIANO JINKIS, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA and CONCACAF, and their constituent organizations, including to deprive FIFA and CONCACAF and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

165.    For the purpose of executing such scheme and artifice, the defendants ARIEL ALVARADO, HUGO JINKIS and MARIANO JINKIS, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds as described below:

57

| Count | Approx. Date | Wire Communication |
|-------|--------------|--------------------|
| FORTY | January 12, 2012 | Email message sent via interstate wire transmission by ALVARADO to CONCACAF officials in New York, New York, and copying Alfredo Hawit, attaching a revised agenda for the CONCACAF executive committee meeting in Miami, Florida on January 15, 2012. |
| FORTY-ONE | April 17, 2012 | Email message sent via interstate wire transmission by ALVARADO to CONCACAF officials in New York, New York attaching proposed contract between FULL PLAY and CONCACAF. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT FORTY-TWO
(Wire Fraud Conspiracy – UNCAF Region Friendlies Scheme)

166.    The allegations contained in paragraphs 1 through 112 are realleged

and incorporated as if fully set forth in this paragraph.

167.    In or about and between May 2012 and December 2015, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally

conspire to devise a scheme and artifice to defraud FIFA, CONCACAF and FESFUT and

their constituent organizations, including to deprive FIFA, CONCACAF and FESFUT and

their constituent organizations of their respective rights to honest and faithful services

through bribes and kickbacks, and to obtain money and property by means of materially false

and fraudulent pretenses, representations and promises, and for the purpose of executing such

scheme and artifice, to transmit and cause to be transmitted by means of wire communication

in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire

transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT FORTY-THREE
(Wire Fraud – UNCAF Region Friendlies Scheme)

168.     The allegations contained in paragraphs 1 through 112 are realleged

and incorporated as though fully set forth in this paragraph.

169.     On or about the date set forth below, within the Eastern District of New

York and elsewhere, the defendant REYNALDO VASQUEZ, together with others, did

knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF and

FESFUT and their constituent organizations, including to deprive FIFA, CONCACAF and

FESFUT and their constituent organizations of their respective rights to honest and faithful

services through bribes and kickbacks, and to obtain money and property by means of

materially false and fraudulent pretenses, representations and promises.

170.     For the purpose of executing such scheme and artifice, the defendant

REYNALDO VASQUEZ, together with others, did transmit and cause to be transmitted, by

means of wire communication in interstate and foreign commerce, writings, signs, signals,

pictures and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|--------------|--------------------|
| FORTY-THREE | October 17, 2014 | Wire transfer of approximately $10,000 from an account at Bank of America in Wellington, Florida, to a Bank of America correspondent account in New York, New York, for credit to an account in the name of Mobilia, S.A. at Banco Promerica in El Salvador. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT FORTY-FOUR
(Money Laundering Conspiracy – UNCAF Region Friendlies Scheme)

171.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

172.    In or about and between May 2012 and December 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT FORTY-FIVE
(Money Laundering – UNCAF Region Friendlies Scheme)

173.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

174.    In or about and between October 2014 and December 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant REYNALDO VASQUEZ, together with others, did knowingly and intentionally transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

## COUNT FORTY-SIX
(Wire Fraud Conspiracy – CFU World Cup Qualifiers Scheme #2)

175.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

176.    In or about and between January 2012 and December 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant GERARD ROMY, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF and CFU and their constituent organizations, including to deprive FIFA, CONCACAF and CFU and their constituent organizations of their respective rights to honest and faithful services through bribes and

kickbacks, and to obtain money and property by means of materially false and fraudulent

pretenses, representations and promises, and for the purpose of executing such scheme and

artifice, to transmit and cause to be transmitted by means of wire communication in interstate

and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers,

emails and telephone calls, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT FORTY-SEVEN
(Money Laundering Conspiracy – CFU World Cup Qualifiers Scheme #2)

177.    The allegations contained in paragraphs 1 through 112 are realleged

and incorporated as if fully set forth in this paragraph.

178.    In or about and between January 2012 and December 2015, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant GERARD ROMY, together with others, did knowingly and intentionally conspire

to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers,

from places in the United States to and through places outside the United States and to places

in the United States from and through places outside the United States, (a) with the intent to

promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title

18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section

1956(a)(2)(A), and (b) knowing that the monetary instruments and funds involved in the

transportation, transmission, and transfer represented the proceeds of some form of unlawful

activity and knowing that such transportation, transmission and transfer was designed in

whole and in part to conceal and disguise the nature, the location, the source, the ownership

and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT FORTY-EIGHT
(Unlawful Procurement of Naturalization)

179.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

180.    On or about and between March 24, 2005 and July 11, 2006, both dates being approximate and inclusive, within the Central District of California, the defendant EUGENIO FIGUEREDO, together with others, did knowingly and intentionally procure, contrary to law, his naturalization, in that the defendant did knowingly and intentionally make one or more false statements under oath, in a case, proceeding and matter relating to naturalization and citizenship, to wit: FIGUEREDO did falsely state that (1) he was only employed by Sunburst Decorative Rock in Irwindale, California and neither worked anywhere else in the previous five years nor ever had any affiliation with any organization or association in the United States or in any other place; and (2) he had a medical impairment, to wit: dementia, and thus was unable to complete the required English language and civics competency exams.

(Title 18, United States Code, Sections 1425(a), 2, and 3551 et seq.; Title 8, United States Code, Section 1451(e))

63

## COUNTS FORTY-NINE THROUGH FIFTY-THREE
(Aiding and Assisting in the Preparation of False and Fraudulent Tax Returns)

181.    The allegations contained in paragraphs 1 through 112 are realleged and incorporated as if fully set forth in this paragraph.

182.    On or about the dates set forth below, within the Central District of California, the defendant EUGENIO FIGUEREDO, together with others, did willfully aid and assist in, and procure, counsel and advise the preparation and presentation to the Internal Revenue Service under the internal revenue laws, of FIGUEREDO's U.S. Individual Income Tax Returns, Forms 1040 and attached Schedules and Forms, which were false and fraudulent as to material matters, to wit: among other things, FIGUEREDO falsely stated the amount of taxable income and failed to report his financial interest in a foreign bank account in the following years:

| Count | Tax Year | Approximate Filing Date |
|-------|----------|-------------------------|
| FORTY-NINE | 2009 | March 08, 2010 |
| FIFTY | 2010 | March 03, 2011 |
| FIFTY-ONE | 2011 | April 06, 2012 |
| FIFTY-TWO | 2012 | March 22, 2013 |
| FIFTY-THREE | 2013 | April 01, 2014 |

(Title 26, United States Code, Section 7206(2); Title 18, United States Code, Sections 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT ONE

183.    The United States hereby gives notice to the defendants charged in Count One that, upon their conviction of such offense, the government will seek forfeiture in

64

accordance with Title 18, United States Code, Section 1963(a), which requires any person or

entity convicted of such offense to forfeit: (a) any interest acquired or maintained in violation

of Title 18, United States Code, Section 1962; (b) any interest in, security of, claim against,

or property or contractual right of any kind affording a source of influence over, any

enterprise which the defendant established, operated, controlled, conducted or participated in

the conduct of, in violation of Title 18, United States Code, Section 1962; and (c) any

property constituting, or derived from, any proceeds obtained, directly or indirectly, from

racketeering activity in violation of Title 18, United States Code, Section 1962.

184.    If any of the above-described forfeitable property, as a result of any act

or omission of the defendants:

a)      cannot be located upon the exercise of due diligence;

b)      has been transferred or sold to, or deposited with, a third party;

c)      has been placed beyond the jurisdiction of the court;

d)      has been substantially diminished in value; or

e)      has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section

1963(m), to seek forfeiture of any other property of the defendants up to the value of the

forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 1963(a) and 1963(m))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS TWO THROUGH FOUR, SEVEN, NINE THROUGH
TWENTY, TWENTY-TWO THROUGH TWENTY-FIVE, TWENTY-SEVEN,
TWENTY-NINE THROUGH THIRTY-FIVE, THIRTY-SEVEN,
THIRTY-NINE THROUGH FORTY-THREE AND FORTY-SIX

185.    The United States hereby gives notice to the defendants charged in

Counts Two through Four, Seven, Nine through Twenty, Twenty-Two through Twenty-Five,

Twenty-Seven, Twenty-Nine through Thirty-Five, Thirty-Seven, Thirty-Nine through Forty-

Three and Forty-Six that, upon their conviction of any such offenses, the government will

seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and

Title 28, United States Code, Section 2461(c), which require any person convicted of such

offenses to forfeit any and all property, real or personal, which constitutes or is derived from

proceeds traceable to a violation of such offenses.

186.    If any of the above-described forfeitable property, as a result of any act

or omission of the defendants:

a)    cannot be located upon the exercise of due diligence;

b)    has been transferred or sold to, or deposited with, a third party;

c)    has been placed beyond the jurisdiction of the court;

d)    has been substantially diminished in value; or

e)    has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any

66

other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS FIVE, SIX, EIGHT, TWENTY-ONE,
TWENTY-SIX, TWENTY-EIGHT, THIRTY-SIX, THIRTY-EIGHT,
FORTY-FOUR, FORTY-FIVE AND FORTY-SEVEN

187.    The United States hereby gives notice to the defendants charged in Counts Five, Six, Eight, Twenty-One, Twenty-Six, Twenty-Eight, Thirty-Six, Thirty-Eight, Forty-Four, Forty-Five and Forty-Seven that, upon their conviction of any of such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offenses to forfeit any and all property, real or personal, involved in such offenses, or any property traceable to such offenses.

188.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a)      cannot be located upon the exercise of due diligence;

b)      has been transferred or sold to, or deposited with, a third party;

c)      has been placed beyond the jurisdiction of the court;

d)      has been substantially diminished in value; or

e)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b); Title 21, United States Code, Section 853(p))

### CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNT FORTY-EIGHT

189.    The United States hereby gives notice to the defendant EUGENIO FIGUEREDO that, upon his conviction of the offense charged in Count Forty-Eight, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(6), which requires any person convicted of such offense to forfeit: (a) any conveyance, including any vessel, vehicle or aircraft used in the commission of such offense; and (b) any property, real or personal, that constitutes or is derived from proceeds obtained directly or indirectly from the commission of such offense, or that is used to facilitate or intended to be used to facilitate the commission of such offense.

190.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a)    cannot be located upon the exercise of due diligence;

b)    has been transferred or sold to, or deposited with, a third party;

c)    has been placed beyond the jurisdiction of the court;

d)    has been substantially diminished in value; or

e)       has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any

other property of the defendant up to the value of the forfeitable property described in this

forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(6) and 982(b); Title 21, United

States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

69

F.#: 2015R00747
FORM DBD-34
JUN. 85

No.  15-252 (S-3) (PKC)

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

HUGO JINKIS, MARIANO JINKIS, FULL PLAY GROUP S.A., HERNAN LOPEZ, CARLOS MARTÍNEZ, GERARD ROMY, ARIEL ALVARADO, MANUEL BURGA, LUÍS CHIRIBOGA, MARCO POLO DEL NERO, EDUARDO DELUCA, EUGENIO FIGUEREDO, JOSÉ LUIS MEISZNER, ROMER OSUNA, RICARDO TEIXEIRA, REYNALDO VASQUEZ, AND JACK WARNER,

Defendants.

## SUPERSEDING INDICTMENT

(T. 8, U.S.C., § 1451(e); 18, U.S.C., §§ 981(a)(1)(C), 982(a)(1), 982(a)(6), 982(b), 1343, 1349, 1425(a), 1956(a)(2)(A), 1956(h), 1962(d), 1963, 1963(a), 1963(m), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 26, U.S.C., § 7206(2); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____

_Foreperson_

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____

_Clerk_

*Bail, $* _____

**Samuel P. Nitze, M. Kristin Mace, Keith D. Edelman, Patrick T. Hein, Kaitlin M. Farrell, David M. Pitluck, Brian D. Morris, *Assistant U.S. Attorneys (718) 254-7000***